Terrebonne Housing Authority. We hear first from Mr. Hutchinson. May it please the court, my name is Park Hutchinson. I'm presenting argument on behalf of plaintiffs. If you'd voice up if you would, you got a couple people here who don't hear real well. Sure, thank you. It's acoustics in this building. Each year we lose more and more. I want to jump right into the first issue and that is whether the facts of this case can constitute a prima facie case of an adverse employment action for the purposes of a retaliation claim under Title VII. This is truly an issue of first impression for this court and for any court of appeals. The one court of appeals case that was cited by Appellee, the Wilkerson case, is distinguishable because it was not a retaliation case subject to Burlington and in fact was decided before the Burlington decision. So the only directly controlling precedent here before the court is Burlington Northern and Santa Fe Railway Company v. White in which the Supreme Court of the United States considered the standard for adverse employment actions in the context of a Title VII retaliation claim. And that case established that the alleged adverse action must be materially adverse which means it, quote, might have dissuaded a reasonable worker from making or supporting a charge of discrimination. And as this court has recognized, Burlington requires that an adverse employment action must be viewed in context. And the facts of this case are rich and distinguishable from the case law cited in the district courts by Appellee. First of all, there's Sheffield which is decided in 2006 where the court's ruling was explicitly based on its finding that the employment relationship at issue had ended. The court said, quote, failure to accept a previous employee's rescission of his voluntary resignation is not an adverse employment action for the simple reason that the employment relationship had ended. In that case, the court hinged its decision on whether the employer company had regarded the working relationship as ended. And that case was decided under very different circumstances where an employee who was brought in to address improprieties in the workplace unpromptly stated, I'll save you some time. I cannot deal with this right now. I'm out of here. He relinquished his employee ID card and left the office at which point his employers immediately began processing his termination and he only returned later for what were called reinstatement talks which underscores the notion that he, in fact, was no longer an employee. Next, there is Smith v. Dattar which incidentally is the only district court case to consider the circuit, the court considered a voluntary resignation as having taken effect. And the court there in keeping with Burlington paid close attention to the facts, in fact, provided a thorough recitation and evaluation and based its ruling that the resignation had had taken its effect on numerous facts including that the plaintiff had packed up family photographs, another personal belongings from her office, told a co-worker that she, quote, couldn't take it anymore, hugged her co-workers goodbye, asked for reference, left the premises with a box of her personal effects, did not deny having walked off the job when she was called to confirm that she had, quote, thrown in the towel and never attempted to contact anyone at the company to explain that she had not intended to abandon her job or seek reinstatement. And the facts of this case not to go into too much detail are sharply distinguishable because in this case it is undisputed that the plaintiff was actively employed at the time she attempted to rescind her resignation, that she had been encouraged to reconsider her resignation by not only her direct supervisor but also the chairman of the board of the Homa Terrible in Housing Authority and that she had decided to attempt to rescind her resignation after her grievances were heard and had been addressed and found meritorious by the Homa Terrible in Housing Authority. Let me ask you, how many times had she either resigned or threatened to resign? She did leave, she began employment in 2001, left the Homa Terrible in Housing Authority, I believe, sometime in 2005 for a period of seven months to begin work in a chemistry lab at which point her direct supervisor, who continued to be a direct supervisor, requested that she return. And she did so in 2006 where she remained until these events transpired. In June of the relevant year, she expressed a desire to resign. She stayed on throughout a period which is up to August 1st and then requested to extend her employment until September 1st. Okay, but weren't there some incidents, maybe she denies it, I'm not sure that there's anything in the record where she denied it, but at least her supervisor said that she had discussed with her leaving and that she'd been looking for another job. I mean, they had more than one discussion about that as I understand it. Is that right? The deposition testimony of her supervisor shows that she had made comments on occasion that she wished to resign. Whether she stated that she was going to look for another job, I think is respectfully not relevant to the issue of either the causation or the adverse employment action. Well, wasn't that one of the reasons given though for not accepting her decision was that she was, you know, that this was somewhat kept the office in turmoil with her threatening to leave and being kind of general knowledge that she was looking for another job and so left the workforce and the supervisor in a quandary as to whether, you know, how long she's going to be there and whether her job was going to get done. Did he need to find somebody else? Yes, Your Honor. I do not believe that the record supports the contention that appellees are making to the extent that they say it does. Her direct supervisor, Mr. Thibodeau, who was incidentally the subject of the grievances and whose behavior was found to be inappropriate, did state that the reason that she was, her resignation decision was not accepted was that she seemed unhappy at her job, which we contend is a pretextual and non-legitimate proposition. She had gone through the grievance process at that point and her concerns and her reasons and her unhappiness in the position were addressed. And I'll just read to you briefly the board's message to Mr. Thibodeau, the executive director, that addressed Ms. Porter's concerns. Mr. Alan Luke, the chairman, said, we had a thorough discussion concerning the need to be more aware of words, gestures, or any behaviors in the presence of any employees that could potentially be deemed offensive or in even if you don't perceive them as such. Also, you should never place yourself between an exit and an employee where the employee may perceive you as being an impediment from leaving the room or meeting. I do believe the use of terms sexy voice to any employee is unacceptable and will likely result in consequences if ever used again. And Ms. Porter has testified that after these steps were taken and additionally the imposition of sexual harassment training for all of the staff, she felt that she wanted to remain in that job and she no longer had any qualms and in fact wrote to her supervisor and Mr. Thibodeau stating that she considered her job a calling, her grievances were heard, and she stated in no mince words that she felt an immense reward from for the HTHA and for the people of public housing that she considered that she was doing God's work and this is not incident to any litigation. This was in real time in the attempt to rescind her resignation. So I think when she left before, this was before the sexual harassment, any implication that was involved, is that right? In 2005, that was before the HTHA hired Mr. Wayne Thibodeau, who was the alleged harasser. Yes, sir. When did the sexual harassment allegedly start? It began, I believe, in 2007 or 2006 upon the commencement of Mr. Thibodeau's employment in which he began to request Ms. Porter take overnight trips with him, commented on her wardrobe, commented on her physicality, left her voicemails and emails, which to be fair, he later denied until confronted with hard evidence of them, which we believe goes to his credibility in making the, in proffering the legitimate reason which they're required to do under the McDonnell-Douglas program. Let me ask you, I mean, wouldn't it be a condemnation if the employer legitimately believed that the employee was not happy there and that she was looking for another job and that she might not stay very long? I think the proper reason is weak. I think that is if not overstated to the fact it was here in the arguments leading up to this hearing. The way I state it, would that be a legitimate reason to say, look, you've resigned and we've accepted it and goodbye and good luck? Yes, Your Honor, that may be a legitimate reason. Under the facts of this case, we dispute that it is. We believe it was pretextual based on any number of reasons, including... Tell me why it was pretextual. First of all, there was close proximity to the action taken against Mr. Thibodeau. This decision happened 18 days after the letter admonishing him for his behavior. There is no question that there's evidence that Ms. Porter liked her job, immensely found it considered leaving because of the alleged harassment by Mr. Thibodeau. There's no question in the record that she had the support and was encouraged to rescind her resignation and remain at the HTA, both by her direct supervisor and by the chairman of the board of the authority. There's no question that Mr. Thibodeau, who was the subject of her grievances, which are protected under law, was the one making the ultimate decision here. I think that there is clearly, there has been shown evidence of a retaliatory animus from Mr. Thibodeau, even if those reasons might be circumstantial. We also have testimony from Ms. Porter that shows that several other employees had resigned and then been allowed to rescind their resignations. So I believe that speaks to both issues here. Your questions, Your Honor. We just want to touch very briefly on the cadet decision, which is the third case out of the four cases cited by Appellees, which bases its ruling essentially on the notion of at-will employment and says that because there is no obligation to accept an attempted rescission of a resignation under the law, then it is not protected under Title VII. And our position is that neither a pure at-will system is an employer obligated to employ anyone at all, but it is undeniable that firing would be protected under Title VII. And the argument in that court in that way is tautological. And we also want to address the argument made in Jones v. McCormick and Schmitz, which is also factually opposite for many reasons, but the policy argument that is advanced in Appellee's brief and in this case is cited incompletely, but they note the impossible position of an employer who simultaneously confronted with a protected activity and an attempt to rescind a resignation, an impossible position, either accept the rescission and hope for no lawsuit or don't and allow a lawsuit to proceed. And we think that that is a false choice, it is a policy argument, and then they're advocating a gatekeeping function on prong two, which is whether an adverse employment action occurred when those things should properly be understood under the causation rubric, which is prong three in this case. Thank you. Okay, thank you, Mr. Christie. Good morning, Your Honors, and may it please the Court. My name is Josh Christie and I represent the Homo Terribone Housing Authority, I'll refer to them as the ATHA throughout this argument, the Appellee in this case. Your Honors, we're here today as a result of the District Court's grant of summary judgment on the plaintiff's Title VII retaliation claim. The District Court properly granted summary judgment for two reasons. It found that because Mrs. Porter had resigned from her position, she could not have suffered an adverse employment action under Title VII in the context of retaliation, and it also found that she could not show that but for the alleged report of sexual harassment, she would not have been allowed to rescind her resignation. I'll address the first reason. As a matter of law, Mrs. Porter did not suffer an adverse employment action. Your Honors, I believe that Burlington Northern is very on point in this case, although as opposing counsel probably pointed out, the circuit courts have not decided a similar case in the wake of Burlington Northern. Burlington Northern addressed the adverse employment action prong in a Title VII retaliation claim, and it held that a reasonable, excuse me, it held that the standard would be that a reasonable employee would have found the challenge action materially adverse, which, quote, in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination, unquote. Now, the Supreme Court in Burlington Northern went further and addressed that this is an objective standard. It refers to the actions of a reasonable employee because the court believed that the provisions, the Title VII's retaliation provisions standard for judging harm must be objective. An objective standard is judicially admissible, according to the Supreme Court. Now, on that level alone, applying the objective standard to the facts of this case, I'll briefly just address the timeline. Mrs. Porter issued a letter of resignation on June 6th of 2012, given no reasons for her resignation. At that point, the HTHA was unaware of any allegations of sexual harassment. This was a voluntary resignation. On that resignation, according to that resignation, the effective date would be August 1st of the same year. On July 25th, 2012, she wrote a letter asking to extend her resignation date so that she may close out some issues that she was working on. The next day, on July 26th, she participated in a grievance hearing in front of the Board of Commissioners of the HTHA, which was filed by her fiance, but part of her testimony during that grievance hearing was that she had been sexually harassed by one of her supervisors, Mr. Wayne Thibodeau. This was the first time that she had made allegations of sexual harassment to the HTHA. On September 4th, she came to work and she made two requests. One, she requested to that she was entitled to. That request was granted, and at effective 1 o'clock that day, on September 4th, she left and didn't return to work. On September 10th, Mr. Thibodeau wrote Mrs. Porter a letter stating that they would not accept her rescission request and that her effective end date with the HTHA would be November 12th. Going back to the objective standard from June, she engaged in protected activity in July. Under that objective standard, I can't understand how it could deter a reasonable employee who was intending to leave work from engaging in the protected activity, i.e. making allegations of sexual harassment. I think on that an adverse employment action when she makes allegations of sexual harassment later. Counsel, my difficulty, not saying I'm rejecting it, my difficulty with that argument is that once you get into the facts of this case, the allegations of the evidence from plaintiff's side, is that it was her disgust over Wayne Thibodeau that was causing her to be dissatisfied with her work at your client's facility. That's why she was resigning. After the grievance hearing, or whatever that was called, she attempted to rescind her resignation. Then you have to look at, it seems to me, the causation that led to the refusal to allow her to rescind her resignation. All of it is circumstantial, but there's at least something that some fact finders might rely on based on the fact that Mr. Thibodeau was the final decision maker. It was done shortly after this grievance hearing, which led to some sort of directives to him to clean up his act. I don't know what else he was told to do. Someone whose recommendation, I forget who the supervisor was, you no doubt know the name, recommended that she be retained. This was the first time that such a recommendation had been overridden by a supervisor or by Mr. Thibodeau. Doesn't all that make a fact question as to whether the failure to allow her to remain at that job site, her resignation was initiated because of her sense of being mistreated by Mr. Thibodeau? Doesn't all that make a fact question about, A, that there is a causal connection, and B, when you look at Burlington Northern, and not to get caught up in mere labels, Burlington Northern says, context matters, and you've got to look at the whole circumstances that we're talking about. Doesn't all that make a fact question case that gets beyond summary judgment? Your Honor, I'll address that in two parts. Respectfully. Talk first about causation. What is wrong with the causation argument? Your Honor, the causation argument, respectfully, the record, I don't believe, suggests the statements that you just made and some of the statements that opposing counsel made. Her initial letter of recommendation, in July, or in June, gave no reasons for her desire to leave the HTHA. Can't she add the reasons in litigation? She can, but other than her self-serving testimony during her deposition, she's offered no other testimony, affidavits of fellow employees, affidavit of her fiance. Most testimony is self-serving. You're right, Your Honor. That characterization doesn't, if it, you're guessing, will not escape a conflict and a grand summary judgment. Your Honor, respectfully, I think. Forgetting that causation, whether her statements subsequently about why Thibodeau's actions toward her were the reason that she was deciding to resign, sort of pick it up from there. Why is that heading towards a causation, evidence of causation? Your Honor, I don't think that produces sufficient evidence of causation because the record actually is contrary to those allegations. And we have the testimony of her supervisor, Jan Jakubczak, and the HTHA human resources person, Naquanda Jefferson, who both stated that they were under the impression that the only reason she was asking to rescind her resignation was so that she could have time to look for another job. She, other than her own testimony, which I believe is not enough to create an issue of fact for the purpose of summary judgment. Because it is her statement, is that, are you saying as a category that can't be enough to get us past summary judgment? If you'll bear with me for one second, Your Honor. Your Honor, I'm sorry. If I can take a step back. Regarding the causation element, I believe you're referring to the third element of a The third element of a causation claim can be established, or the third element of a retaliation claim, can be established by her simple showing of pretext alone. Now that, once she meets that prima facie burden, the McDonnell-Douglas burden-tripping framework comes into play. And the causation element is analyzed two steps further. The first step of that is that the employer, the employer's burden is to give a legitimate, non-retaliatory reason. Let's accept that such a reason was given. So we're now looking at whether her evidence supports that this was just a pretext. I don't believe her evidence does support. The only record evidence that she gives in support of that is the temporal proximity, which this Court has held. Temporal proximity on its own is not enough to overcome her burden. Well, you say that's the only evidence. It's temporal proximity. There's the fact that the final decision maker was the person to whom, or against whom she had these charges. There was a recommendation that had not previously been overridden by some sort of supervisor, that she ought to be retained, and that was overridden in this case. We're not going to have admissions, probably, as to whether there's retaliation or not. Isn't that some evidence beyond mere temporal proximity, the fact that Thibodeau was a decision maker and that he overrode an otherwise controlling or historically controlling recommendation to retain her? Your Honor, I don't believe him overriding Jan Jakubczak's recommendation in support of Ms. Porter is enough to rebut our legitimate nondiscriminatory reason, because Jan Jakubczak also stated that she was aware that Mrs. Porter was only attempting to rescind her resignation so that she could look for another job. The human resources officer, I might be mischaracterizing her position, Naquanna Jefferson, said the same thing and took it one step further and actually testified that she wanted to keep benefits to be able to support her family while she looked for another job. So I don't believe that the fact that Wayne Thibodeau was the ultimate decision maker, temporal proximity, and Jan Jakubczak's statement are enough. Didn't you have Mr. Luke also, the chairman of the authority, who suggested to her that she ought to reconsider? Your Honor, I believe, and I was going to address that, I believe plaintiff's briefing mischaracterizes Mr. Luke's deposition testimony. Mr. Luke testified that he discussed the possibility of Mrs. Porter rescinding her resignation. This was prior to her even engaging in protected activity. His testimony doesn't go so far as to suggest that he asked her to rescind her resignation. Didn't you say that he did? I can't confirm that, Your Honor. I'm not 100% sure of her testimony in that regard. However, Mr. Luke's testimony does not go so far. So what we're left with is temporal proximity. I don't believe that because Mr. Thibodeau was the inference that the legitimate non-retaliatory reason is false. It's an unusual case, though, when you're arguing, trying to overcome pretext that the person who has been the subject of the discriminatory allegations is the final decision maker. The specificity of the charges against him and then he makes the final decision does make this a somewhat unusual case, it seems to me. Well, Your Honor, I believe the facts of the case are unique. But the fact that he was the ultimate decision maker is not in itself good enough to rebut the non-discriminatory or non-retaliatory reason that we've proffered. It's the plaintiff's burden to overcome that. And other than her testimony, combined with the temporal proximity, I don't think the record gives any evidence that she wished to rescind her resignation. I'm sorry. I don't believe the record gives any evidence that the legitimate non-retaliatory reason was false. This Court has held that they may do it by the reason. Ms. Porter, in her brief attempts to do that, by pointing to statements made during Mr. Thibodeau's deposition that I would assert don't show that he was being uncredible. In fact, one of the statements that the opposing counsel pointed out was that Mr. Thibodeau denied leaving voicemails. If you read the briefing, he denied remembering leaving voicemails when played the voicemails where he referred to a sexy voice. He acknowledged it and offered his reason in context for giving that. I don't think that calls into question his credibility at all. I also don't think that just because he was the person who decided not to accept her request for rescission implicates his credibility either. What is the evidence here of the historical record on people being allowed to withdraw their resignations? Your Honor, the record other than Ms. Porter's deposition testimony, which wasn't cited in plaintiff's briefing on the motion for summary judgment and has not been cited here, there were some statements during her deposition about other employees. I'm sorry, Your Honor? There were other persons that had resigned or offered to withdraw their resignations. Mrs. Porter made those allegations in her deposition testimony. They weren't substantiated anywhere in the record. They weren't set forth on the motion for summary judgment. They haven't been brought up here except for counsel's assertions during oral argument. But briefly, did the plaintiff testify that there were four other persons? Did someone testify to that? What's in the record about the other resignations, the unaccepted resignation? During her deposition, Mrs. Porter did say that. However, what did she say just to give us something against which to judge what you say thereafter? Essentially, she said that other employees had resigned and been allowed to rescind their resignation. Did she name them? Did she give dates? Did she? I don't believe so, Your Honor. In response to that, in all those other cases, those employees actually left the HTHA and reapplied to come back. So you did have their names so you could check them out, huh? We are aware of their names, Your Honor. I don't think they're anywhere on the record responding to Judge Southwick's question. Your Honor, if I may go back to my primary argument. Two were maintenance employees, two were housing managers. I think that's what her testimony was. Yes, Your Honor. And those employees, the facts of those employees' resignations and then reacceptance to the HTHA were never explored by Mrs. Porter through depositions, through affidavits. There's nothing on the record to substantiate those claims. Why isn't her testimony enough? She said there were four others that did and that's not challenged. If you have four other persons that have been allowed to do so, why wouldn't that suggest at least a fact question as to whether or not—the question is whether a reasonable jury could accept—could conclude that the assertion of the resignation was pretextual and then indeed that there were—that the reason they would not accept her return back on resignation was because the underlying—it was part of her underlying claim. Your Honor, respectfully, other than a few sentences in her deposition, the record is completely absent of any substantiation for that testimony. She had the opportunity to substantiate any of those claims. She didn't. She didn't in either her briefing for the motion for summary judgment or her briefing on appeal, she didn't pursue that as a reason to show that the legitimate non-retaliatory reason was pretextual. Is what you said earlier in oral argument that all four of those had to reapply, is that in the record? I'm sorry, Your Honor? Is there evidence of what you had said just a few minutes ago that the four she was talking about actually—resignations were accepted, they then reapplied and got their jobs back, is that in the record? Your Honor, I believe my time is about to expire for my answer. You're on my time now. Thank you. Your Honor, as I said, the only record statements are the self-serving statements made by Ms. Porter, which she did not pursue in any of her arguments, either at the trial court level or— Did you file an affidavit from your client saying that these four people had left and then reapplied and came back? Your Honor, we did not. We also did not feel in support of her opposition to our summary judgment motion. All right, counsel. Thank you. Okay, Mr. Hutchinson. Let me ask on what we were just talking about, is it fair to say, as your opposing counsel just did, that the existence of other individuals who allowed to withdraw the resignations that that was not developed factually and that was not part of your summary judgment argument? I believe that would be accurate to say. I also wanted to point out that in the ruling on the summary judgment issue, the district court took care of the causation question summarily in about two sentences. This is de novo, so we'll have to look at it ourselves. All right. You've answered my question. Sure. On the causation issue, the opposing counsel is stating that our position is contrary to the record, that all of the evidence that we're putting forth is self-serving just because it benefits Ms. Porter's claim. I wanted to point to the email that accompanied her attempted rescission of her resignation, the email that Ms. Yusup Yakubczak, her direct supervisor, sent to Mr. Thibodeau along with Ms. Porter's letter. After a lengthy discussion with Tide this morning, she sent a letter to rescind her resignation permanently and remain an employee of the HTHA. She also requested to take a week of annual time to sort things out. I fully support her request to remain an employee of the HTHA and trust that you will too. We both know that she is an asset to this agency and will continue to help us reach our goals for the communities we serve. The testimony of Ms. Jan Yusupakut that was pointed to by opposing counsel, by Apolise, discussing the alleged unhappiness, the repeated threats by Ms. Porter to resign are not in fact individual observations by her, but the question was asked to her in the context of what do you understand Mr. Thibodeau's reasons to be? That's an important distinction I wanted to point out. It has been brought up that she has attempted to take ... Troy Johnson. What happened with him? I thought it was the case that Troy Johnson was allowed to rescind even though he had filed a grievance against Thibodeau. Could you repeat that, Your Honor? I said, Troy Johnson was allowed to rescind even though he had filed a grievance against Mr. Thibodeau. Is that correct? I cannot confirm that in the record, Your Honor. I'm sorry? I cannot confirm that on the spot in the record, Your Honor. Who was Troy Johnson, her fiancé? And he was the one who brought the initial grievance, the hearing for which is where she testified. Was he employed by the housing authority? He was Ms. Porter's subordinate and fiancé. Well, I thought that he had resigned but they allowed him to rescind his resignation although he had actually filed a grievance against Thibodeau. There was nothing in the grievance that was submitted to the HGHA, Mr. ... I'm sorry, I can't understand what you're saying. I'm sorry, there was nothing in the physical grievance that was submitted that touches on that issue so I'm unable to confirm right here in the courtroom that that is the case. About the record at page 235, you can check that later. Thank you. In the record, I also wanted to point out that before her resignation in 2010, Ms. Porter had notified her direct supervisor of the inappropriate voicemails noting a sexy voice that were left by Mr. Thibodeau. So she had made some complaints about the inappropriate behavior before her resignation was tendered. It is irrelevant whether she attempted to take any personal leave or was granted personal leave. In fact, the fact that she had to request and was entitled to accrued personal leave time only supports our position that she was employed at that time by the HGHA. She would not have to request personal time. It would not be allowed to take that accrued time. Who did she complain to when she complained about the phone call? To her direct supervisor, Ms. Ukupsik. She didn't go to HR or anybody above her supervisor? She had discussed it with Ms. Ukupsik and they had retained the recording of the voicemail, which was why it was able to be played at the deposition of Mr. Thibodeau. Okay, thank you very much, sir. Thank you, counsel. We have the case.